ORIGINAL

Approved: _____
ANDREW THOMAS
Assistant United States Attorney

18 MAG. 4640

Before:  THE HONORABLE SARAH NETBURN
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

- v. -

WOOJAE JUNG,
 a/k/a "Steve Jung,"

        Defendant.

- - - - - - - - - - - - - - - x

SEALED COMPLAINT

Violations of
15 U.S.C. §§ 78j(b) & 78ff;
17 C.F.R. § 240.10b-5; and
18 U.S.C. §§ 371 & 2

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

JOHN RUANE, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

## COUNT ONE

(Conspiracy to Commit Securities Fraud)

1.  From at least in or about February 2015, up to and including in or about September 2017, in the Southern District of New York and elsewhere, WOOJAE JUNG, a/k/a "Steve Jung," the defendant, and others known and unknown, knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

2.  It was a part and an object of the conspiracy that WOOJAE JUNG, a/k/a "Steve Jung," the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce and of the mails, and of the facilities of national securities exchanges, would and did use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business

which operated and would operate as a fraud and deceit upon persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

    3.    In furtherance of the conspiracy and to effect the illegal object thereof, the following overt act, among others, was committed in the Southern District of New York and elsewhere:

        a.    On or about February 4, 2015, WOOJAE JUNG, a/k/a "Steve Jung," the defendant, while in New York, New York, caused another person to purchase shares of a particular company based on material non-public information.

(Title 18, United States Code, Section 371.)

## COUNT TWO
(Securities Fraud)

    4.    In or about February 2015, in the Southern District of New York and elsewhere, WOOJAE JUNG, a/k/a "Steve Jung," the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, used and employed manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, to wit, JUNG caused trades in the securities of W.R. Grace & Co. based on material non-public information JUNG had obtained through his employment at a particular investment bank.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT THREE
(Securities Fraud)

    5.    In or about March 2015, in the Southern District of New York and elsewhere, WOOJAE JUNG, a/k/a "Steve Jung," the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, used and employed manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices,

schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, to wit, JUNG caused trades in the securities of Foresight Energy LP based on material non-public information JUNG had obtained through his employment at a particular investment bank.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT FOUR

(Securities Fraud)

6.   From at least on or about August 2015, up to and including in or about February 2016, in the Southern District of New York and elsewhere, WOOJAE JUNG, a/k/a "Steve Jung," the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, used and employed manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, to wit, JUNG caused trades in the securities of SanDisk Corp. based on material non-public information JUNG had obtained through his employment at a particular investment bank.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT FIVE

(Securities Fraud)

7.   From at least in or about October 2015, up to and including in or about October 2016, in the Southern District of New York and elsewhere, WOOJAE JUNG, a/k/a "Steve Jung," the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, used and employed manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal

Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, to wit, JUNG caused trades in the securities of KLA-Tencor Corporation based on material non-public information JUNG had obtained through his employment at a particular investment bank.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT SIX

(Securities Fraud)

8. From at least in or about September 2016, up to and including in or about November 2016, in the Southern District of New York and elsewhere, WOOJAE JUNG, a/k/a "Steve Jung," the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, used and employed manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, to wit, JUNG caused trades in the securities of Microsemi Corporation based on material non-public information JUNG had obtained through his employment at a particular investment bank.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT SEVEN

(Securities Fraud)

9. From at least on or about May 2017, up to and including in or about August 2017, in the Southern District of New York and elsewhere, WOOJAE JUNG, a/k/a "Steve Jung," the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, used and employed manipulative and deceptive

devices and contrivances in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, to wit, JUNG caused trades in the securities of CA Inc. based on material non-public information JUNG had obtained through his employment at a particular investment bank.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5; and Title 18, United States Code, Section 2.)

10. I have been a Special Agent with the FBI since 2017. I am currently assigned to a squad responsible for investigating economic crimes, such as violations of the federal securities laws and related offenses, including mail fraud, wire fraud, and bank fraud. I have participated in investigations of securities fraud and other complex financial crimes, and have participated in arrests of individuals who have committed such offenses.

11. The information contained in this Complaint is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources, including, but not limited to: (a) business records and other documents, including trading records, telephone records, records of electronic communications, and Internet Protocol ("IP") address logs, provided by various entities; (b) publicly available documents; (c) conversations with an employee of a brokerage firm with knowledge of the firm's account log-in recordkeeping; and (d) a review of publicly-available IP address geolocation tools. Because this Complaint is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions and statements of and conversations with others are reported herein, they are reported in substance and in part. Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

### The Defendant and the Investment Bank

12. At all times relevant to this Complaint, WOOJAE JUNG, a/k/a "Steve Jung," the defendant, worked at an investment bank (the "Investment Bank") that provided, among other services, financing and consulting to clients in connection with mergers, acquisitions, and corporate restructurings. The Investment Bank has offices around the world, including in New York, New York, and San Francisco, California.

5

13.     Based on a review of employment records for the Investment Bank and publicly posted social media for WOOJAE JUNG, a/k/a "Steve Jung," the defendant, I have learned that JUNG has been employed at the Investment Bank since in or about July 2012 and currently holds the title of vice president. From in or about July 2012 to July 2015, JUNG worked out of an Investment Bank office in the New York City area. From in or about July 2015 to the present, JUNG has worked out of the Investment Bank's San Francisco, California office.

14.     In connection with its business, the Investment Bank receives and possesses material, non-public information ("MNPI") regarding its clients and other potential parties to mergers, acquisitions, and corporate restructurings. The Investment Bank has adopted policies to safeguard confidential client information. Among other things, the Investment Bank's policies restrict employees from using confidential client information for any purpose other than for the business purpose for which it was conveyed, including prohibiting employees from purchasing or selling securities based on such MNPI.

15.     In his role as a vice president at the Investment Bank, and in his prior role as an associate, WOOJAE JUNG, a/k/a "Steve Jung," the defendant, had access to, among other materials, electronic files maintained on the Investment Fund's computer server, including files containing MNPI relating to various clients.

### The Insider Trading Scheme

16.     As set forth below, I have probable cause to believe that WOOJAE JUNG, a/k/a "Steve Jung," the defendant, used his position at the Investment Bank to obtain MNPI about a number of the Investment Bank's clients and then, in multiple instances, JUNG and a co-conspirator not named as a defendant herein ("CC-1") used that MNPI to cause profitable securities trades. In an effort to conceal this illicit trading, JUNG and CC-1 conducted these illegal trades through a brokerage account held in the name of CC-1, who resides in South Korea (the "Nominee Brokerage Account").

### The Defendant's Access to and Use of
### The Nominee Brokerage Account

17.     Based on public social media posts by WOOJAE JUNG, a/k/a "Steve Jung," and an account in the name of CC-1, I have learned that JUNG and CC-1 both attended the same university in the Republic of Korea, both worked in the investment and finance industry, and both identify each other as contacts on their respective social media accounts.

18.  Based on border crossing records maintained by the U.S. Customs and Border Protection and bank account opening documents, I have learned that by at least in or about October 2015, CC-1, who had previously reported a United States residence, had moved to the Republic of Korea. Since that time, CC-1 has visited the United States on approximately 3 occasions for a total stay of approximately 20 days.

19.  Based on my review of documents maintained by the brokerage firm (the "Brokerage Firm") that maintained the Nominee Brokerage Account, including internet access logs, I have learned the following:

   a.  At the time WOOJAE JUNG, a/k/a "Steve Jung," joined the Investment Bank in July 2012, JUNG held an account in his name at the Brokerage Firm. By September 2012, and as required by the Investment Bank's policies on outside trading accounts, JUNG contacted the Brokerage Firm to close the account in his name.

   b.  In or about August 2012, the Brokerage Firm approved an application to open a securities trading account (the Nominee Brokerage Account) in the name of CC-1. In the application, CC-1 was described as a student residing in Los Angeles, California.

   c.  The account opening documents for the Nominee Brokerage Account do not indicate that anyone other than CC-1 had authority to trade in the Nominee Brokerage Account. The Nominee Brokerage Account was accessed through at least approximately twelve IP addresses located in the United States, including four specific IP addresses ("IP-1," "IP-2," "IP-3," and "IP-4,"). From in or about 2015 and after, trades made in the Nominee Brokerage Account were usually executed by a user logging into the account through IP addresses located in the Republic of Korea, including, among others, two specific IP addresses ("IP-5" and "IP-6").

20.  Based on internet service provider records, comparisons between IP address log-on activity for the Nominee Brokerage Account and a different brokerage account held in the name of WOOJAE JUNG, a/k/a "Steve Jung," the defendant (the "Jung Account"), I believe that JUNG himself also accessed and used the Nominee Brokerage Account to review and conduct securities trades. A review of these records has indicated the following:

   a.  IP-1 is an IP address assigned to a subscriber named "Woojae Jung." IP-1 was used to access the Nominee

Brokerage Account on hundreds of occasions. IP-1 was also repeatedly used to access the Jung Account. The billing address associated with IP-1 is the same as one of the home addresses listed in the Investment Bank's files for JUNG.

    b. At all times relevant to this Complaint, IP-2 and IP-3 were each assigned to a subscriber named "Woojae Jung" and were associated with a particular residence in Manhattan, New York. Based on a review of account opening documents for the Jung Account, I know that the billing address for IP-2 and IP-3 is the same as the mailing address provided by JUNG to open the Jung Account. IP-2 was used to access both the Nominee Brokerage Account and the Jung Account on multiple occasions. IP-3 was used to access the Nominee Brokerage Account on multiple occasions, but has never been used to access the Jung Account.

    c. IP-4, which is associated with the United States, and IP-5, which is associated with the Republic of Korea, were also used to access both the Nominee Brokerage Account and the Jung Account.

    d. Between at least in or about December 2013 and in or about August 2017, the Nominee Brokerage Account was accessed on hundreds of occasions through IP-1, IP-2, or IP-3—the IP addresses subscribed in JUNG's name.

  21. Based on telephone subscriber records, I know that since at least in or about 2010, a particular cellular phone number (the "Jung Telephone Number") has been subscribed to WOOJAE JUNG, a/k/a "Steve Jung," the defendant.

  22. Based on a review of customer service logs maintained by the Brokerage Firm, I have learned that in or about July 2016, a user attempted to transfer $5,600 from the Nominee Brokerage Account to an external bank account held in the name of another individual. The receiving bank rejected the transfer request. On or about July 10, 2016, after the receiving bank rejected the transfer request, a person identifying himself by CC-1's name called the Brokerage Firm from the Jung Telephone Number to inquire about the status of the transfer.

### The Defendant Causes Trades in Securities Based on MNPI Obtained From the Investment Bank

*Insider Trading on Deals in Which the Defendant Was Involved*

  23. Based on a review of public news reports, public stock price information, records maintained by the Brokerage Firm, and records maintained by the Investment Bank, I have learned the following, in substance and in part:

    a. By at least on or about November 10, 2014, the Investment Bank was advising a client, W.R. Grace & Co. ("W.R.

8

Grace"), on its plan to divide itself into two corporate entities (the "Grace Reorganization"). W.R. Grace was a publicly traded company that listed its stock on the New York Stock Exchange (the "NYSE"). By at least on or about November 10, 2014, WOOJAE JUNG, a/k/a "Steve Jung," the defendant, was granted access within the Investment Bank to MNPI concerning the Grace Reorganization. The Investment Bank's file access logs indicate that JUNG accessed files relating to the Grace Reorganization on at least February 3, 2015 and February 4, 2015.

    b. On or about February 4, 2015, the Nominee Brokerage Account began to purchase call options[1] for W.R. Grace stock. These purchases were made by accessing the Nominee Brokerage Account through IP-4. Later that same day, the Nominee Brokerage Account was accessed through IP-3, one of the IP addresses subscribed to JUNG.

    c. On or about February 5, 2015, W.R. Grace publicly announced the Grace Reorganization. By the close of the trading day following the announcement, the price of W.R. Grace stock had increased approximately 12%.

    d. On or about February 5, 2015, the Nominee Brokerage Account sold a set of W.R. Grace call options. On or about February 10, 2015, the Nominee Brokerage Account sold all of its remaining W.R. Grace call options. These sales were made by accessing the Nominee Brokerage Account through IP-4. The Nominee Brokerage Account's trading activity in W.R. Grace options resulted in a profit of approximately $2,494.

    e. Based on a review of trading activity in the Jung Account and the Nominee Brokerage Account, I have learned that, prior to the trading activity described above, neither the Jung Account nor the Nominee Brokerage Account traded in W.R. Grace securities.

  24. Based on a review of public news reports, public stock price information, records maintained by the Brokerage Firm, and records maintained by the Investment Bank, I have learned the following, in substance and in part:

    a. By at least on or about March 12, 2015, the Investment Bank began advising a client, Murray Energy Corporation, on the potential acquisition of a majority stake in another company, Foresight Energy (the "Foresight Deal"). Foresight Energy is a publicly traded company that listed its stock on the NYSE. By at least on or about March 12, 2015,

---

[1] A call option is a contract that confers upon the buyer the right, but not the obligation, to purchase a specified stock at a specified price within a specified time period.

9

WOOJAE JUNG, a/k/a "Steve Jung," the defendant, was granted access within the Investment Bank to MNPI concerning the Foresight Deal. The Investment Bank's file access logs indicate that JUNG accessed files relating to the Foresight Deal on at least March 12, 2015 and March 13, 2015.

        b.    On or about March 13, 2015, the Nominee Brokerage account was accessed through IP-4, an IP address also used to access the Jung Account. Minutes later, the Nominee Brokerage Account bought approximately 400 shares in Foresight Energy stock. These purchases were executed by accessing the Nominee Brokerage Account through an IP address associated with New York, New York.

        c.    On March 15, 2015, Murray Energy Corporation and Foresight Energy publically announced the Foresight Deal. By the close of the trading day following the announcement, the price of Foresight Energy stock had increased by approximately 12%.

        d.    On March 20, 2015, the Nominee Brokerage Account sold its position in Foresight Energy, resulting in a profit of approximately $362. The sale trades were executed by accessing the Nominee Brokerage Account through another IP address associated with New York, New York.

        e.    ' Based on a review of trading activity in the Jung Account and the Nominee Brokerage Account, I have learned that, prior to the trading activity described above, neither the Jung Account nor the Nominee Brokerage Account traded in Foresight securities.

    25.    Based on a review of public news reports, public stock price information, records maintained by the Brokerage Firm, and records maintained by the Investment Bank, I have learned the following, in substance and in part:

        a.    By at least on or about June 25, 2015, the Investment Bank began advising a client, SanDisk Corporation ("SanDisk"), on its possible acquisition by Western Digital Corporation ("Western Digital," and the possible acquisition, the "SanDisk Deal"). At the time, SanDisk was a publicly traded company that listed its stock on the NASDAQ. By at least on or about June 25, 2015, WOOJAE JUNG, a/k/a "Steve Jung," the defendant, was granted access within the Investment Bank to MNPI concerning the SanDisk Deal. The Investment Bank's file access logs indicate that JUNG accessed files relating to the SanDisk Deal throughout September and October 2015.

        b.    Starting on or about August 26, 2015, and continuing until on or about October 19, 2015, the Nominee Brokerage Account bought shares of SanDisk stock and call options on SanDisk stock with a November expiration date. During this time period, the Nominee Brokerage Account was repeatedly

10

accessed through IP-1, including within an hour of the commencement of trading activity on August 26, 2015. A portion of these purchases were executed by accessing the account through an IP address associated with the Republic of Korea and a portion of these purchases were executed by accessing the account through an IP address associated with the United States.

        c.    On or about October 13, 2015, Bloomberg News reported on rumors of acquisition talks between SanDisk and Western Digital. SanDisk's stock price increased approximately 11% following the Bloomberg report.

        d.    On or about October 15, 2015, the Nominee Brokerage Account sold approximately 23 of the previously purchased call options for a profit of approximately $23,603. These sales were executed by accessing the Nominee Brokerage Account through IP-6. On or about October 16, 2015 and October 19, 2015, the Nominee Brokerage Account bought additional call options. These purchases were executed by accessing the Nominee Brokerage Account through IP-6 and an IP address associated with the United States.

        e.    On or about October 21, 2015, SanDisk and Western Digital announced that Western Digital would acquire SanDisk. By the end of the trading day following the announcement, SanDisk's stock price increased an additional approximately 2%.

        f.    On or about February 23, 2016, the Nominee Brokerage account sold approximately 310 shares of SanDisk stock, each of which had been purchased prior to the October 13, 2015 Bloomberg News article. These sales were executed by accessing the Nominee Brokerage Account through IP-6.

        g.    Based on the trading in SanDisk stock between August 2015 and February 2016, the Nominee Brokerage Account made approximately $36,663 in profits.

        h.    Based on a review of trading activity in the Jung Account and the Nominee Brokerage Account, I have learned that, prior to the trading activity described above, neither the Jung Account nor the Nominee Brokerage Account traded in SanDisk securities.

*Insider Trading on Additional Investment Bank Deals*

    26.    Based on a review of public news reports, public stock price information, records maintained by the Brokerage Firm, and records maintained by the Investment Bank, I have learned the following, in substance and in part:

        a.    By at least on or about May 17, 2015, the Investment Bank began advising a client, Lam Research, in connection with its potential acquisition of another company,

11

KLA-Tencor Corporation (the "KLA-Tencor Deal"). KLA-Tencor is a publicly traded company that listed its stock on the NASDAQ. The Investment Bank team advising Lam Research included a particular employee ("Employee-1"), who had access to MNPI concerning the KLA-Tencor Deal.

        b.    Based on cellphone toll and subscriber records, a public Investment Bank presentation, and bank account records for Employee-1, I have learned that a cellphone subscribed to WOOJAE JUNG, a/k/a "Steve Jung," the defendant, was in call contact with telephones used by Employee-1 approximately three times on October 16, 2015, and once on October 18, 2015.

        c.    On or about October 20, 2015, the Nominee Brokerage Account bought approximately 100 call options for KLA-Tencor stock. The option trades were executed by accessing the Nominee Brokerage Account through IP-6. Approximately an hour after the commencement of trading activity, the Nominee Brokerage Account was accessed through IP-1.

        d.    On or about October 21, 2015, KLA-Tencor announced that it would be acquired by Lam Research. The stock price of KLA-Tencor increased approximately 19% at the close of trading the day following the announcement.

        e.    Starting the afternoon of October 21, 2015, and continuing into the morning of October 22, 2015, the Nominee Brokerage Account sold the KLA-Tencor call options for a total profit of approximately $64,000. These trades were executed by accessing the Nominee Brokerage Account through IP-6.

        f.    Based on a review of trading activity in the Jung Account and the Nominee Brokerage Account, I have learned that, prior to the trading activity described above, neither the Jung Account nor the Nominee Brokerage Account traded in KLA-Tencor securities.

    27.    Based on a review of public news reports, public stock price information, records maintained by the Brokerage Firm, and records maintained by the Investment Bank, I have learned the following, in substance and in part:

        a.    Beginning in or about September 2016, the Investment Bank began advising a client, Skyworks Solution, Inc., in connection with a potential acquisition of Microsemi Corporation (the "Microsemi Deal"). Microsemi Corporation is a publicly traded company that lists its stock on the NASDAQ. The Investment Bank team working on the Microsemi Deal included employees in the San Francisco office where JUNG worked.

        b.    On or about September 12, 2016, the Nominee Brokerage Account bought 125 shares of Microsemi Corporation stock. The trades were executed by accessing the Nominee

Brokerage Account through an IP address associated with the Republic of Korea. Based on call detail, subscriber records, and customer service records related to the Nominee Brokerage Account, I know that later that same day the Jung Telephone Number was in call contact with a Korean telephone number associated with CC-1 (the "CC-1 Telephone Number").

   c.   After the end of the trading day on or about November 2, 2016, Bloomberg News published an article about the Microsemi Deal. Microsemi Corporation's stock price increased approximately 15% by the close of trading the following day.

   d.   On or about November 4, 2016, the Nominee Brokerage Account sold all 125 shares of Microsemi Corporation, for approximately $860 in profit. The sale orders were executed by accessing the Nominee Brokerage Account through an IP address associated with the Republic of Korea. Based on call detail and subscriber records, I know that earlier that same day the Jung Telephone Number had been in call contact with the CC-1 Telephone Number.

   e.   Based on a review of trading activity in the Jung Account and the Nominee Brokerage Account, I have learned that, prior to the trading activity described above, neither the Jung Account nor the Nominee Brokerage Account traded in Microsemi Corporation securities.

   28.   Based on a review of public news reports, public stock price information, records maintained by the Brokerage Firm, and records maintained by the Investment Bank, I have learned the following, in substance and in part:

   a.   Beginning in or about April 24, 2017, the Investment Bank began advising a client, a private equity firm with an interest in a company called BMC Software Inc. ("BMC"), in connection with a potential acquisition by BMC of a company called CA, Inc. (the "CA Deal"). CA Inc. is a publicly traded company that lists its stock on NASDAQ. The Investment Bank team working on the CA Deal included a particular employee ("Employee-2"), who had access to, and did in fact access, non-public information about the CA Deal.

   b.   Based on call detail and subscriber records, I have learned that on or about May 11, 2017 and May 12, 2017, WOOJAE JUNG, a/k/a "Steve Jung," the defendant, was in call contact with Employee-2.

   c.   On or about May 30, 2017, the Nominee Brokerage Account purchased 640 shares of CA stock and a number of call options for CA stock. These trades were executed by accessing the Nominee Brokerage Account through a particular IP address associated with the Republic of Korea ("IP-7"). Approximately one hour after this trading activity began, the Nominee

13

Brokerage Account was accessed through IP-1, an IP address assigned to "Woojae Jung."

        d.    On or about June 20, 2017, after the markets closed, news articles reported the existence of negotiations regarding the CA Deal. On June 21, 2017, CA Inc.'s stock closed more than approximately 13% higher than on June 20, 2017.

        e.    On or about July 27, 2017, the Nominee Brokerage Account sold all 640 of its shares of CA stock and a series of call options on CA stock. These trades were executed by accessing the Nominee Brokerage Account through an IP address associated with the Republic of Korea. Within approximately thirty minutes of the start of this trading activity, the Nominee Brokerage Account was accessed through IP-1.

        f.    Hours after the Nominee Brokerage Account's July 27, 2017 trades, the Wall Street Journal reported that the CA Deal had fallen through. As compared to its opening price, CA's stock decreased approximately 10.24% by the close of trading.

        g.    Based on the trading in CA stock between May 30, 2017 and July 27, 2017, the Nominee Brokerage Account made a profit of approximately $9,000.

        h.    Based on a review of trading activity in the Jung Account and the Nominee Brokerage Account, I have learned that, prior to the trading activity described above, neither the Jung Account nor the Nominee Brokerage Account traded in CA Inc. securities.

    29.    Based on a review of public news reports, public stock price information, records maintained by the Brokerage Firm, and records maintained by the Investment Bank, I have learned that, in addition to the trading activity set forth above, the Nominee Brokerage Account also purchased and sold securities of Fairchild Semiconductor International, Inc.; FEI Company; Nimble Storage Inc.; NXP Semiconductors NV; and WebMD Health Corp, and did so after other Investment Bank employees first possessed MNPI about those same companies. In total, and across all of the trading activity referenced in paragraphs 23 through 29, the Brokerage Account obtained more than approximately $130,000 in profits.

### The Scheme Ends

    30.    From reviewing correspondence between the SEC and the Investment Bank, I have learned that on or about August 24, 2017 and August 30, 2017, the United States Securities and Exchange Commission (the "SEC") requested information from the Investment Bank related to the deal teams and which employees had MNPI access for, among other things, the Grace Reorganization, the

Foresight Deal, the SanDisk Deal, the KLA-Tencor Deal, and the CA Deal.

    31.  On or about September 26, 2017, an individual using CC-1's name called the Brokerage Firm. The call was audio recorded. Based on a review of the recording and associated customer service logs, I have learned that the caller said, in substance and in part, that (a) the account had been set up with the caller's stolen identifying information, (b) the money in the account was not the caller's money, and (c) the caller was very worried about the nature of the transactions in the Nominee Brokerage Account and the Brokerage Firm could take the funds in the account.

    WHEREFORE, I respectfully request that an arrest warrant be issued for WOOJAE JUNG, a/k/a "Steve Jung, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

_____
Special Agent John Ruane
Federal Bureau of Investigation

Sworn to before me this
30th day of May, 2018

_____
HONORABLE SARAH NETBURN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

15